**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**KEEHFUS LIMITED PARTNERSHIP,**
**KEEHFUS HOLDING CO., LLC, and**
**GARY L. KEEHFUS,**

        **Plaintiffs,**                  1:06-CV-987
                                                          (GLS\DRH)

        **v.**

**FROMKIN ENERGY, LLC and**
**LEWIS FROMKIN,**

        **Defendants.**
_____

**APPEARANCES:**                     **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

TABNER, RYAN LAW FIRM      BENJAMIN F. NEIDL, ESQ.
18 Corporate Woods Boulevard
Albany, New York 12211-2605

**FOR THE DEFENDANTS:**

OFFICE OF JON L. SWERGOLD, PA    JON L. SWERGOLD, ESQ.
2255 Glades Road
Suite 337 West
Boca Raton, Florida 33431

**Gary L. Sharpe**
**U.S. District Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

After Fromkin Energy and Keehus Holding entered into a partnership

agreement for the purpose of drilling oil and gas wells, Keefhus commenced this lawsuit, alleging, *inter alia*, that Lewis Fromkin and Fromkin Energy, LLC violated the Securities Exchange Act of 1934, 15 U.S.C. § 78(j).[1]  *See Dkt. No. 1*.  On October 27, 2006, defendants filed a motion to dismiss, which the court denied with leave to renew.  *See Dkt. Nos. 15, 32*.  On March 13, 2007, defendants renewed their motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See Dkt. No. 36.*  For the reasons that follow, defendants' motion is granted in part and denied in part.

## II. Facts

In 2005, Lewis Fromkin solicited potential investors in an oil and gas drilling venture that he planned to undertake on land in Pennsylvania.  *See Compl. ¶16, Dkt. No. 1.*  In September of that year, Fromkin met with Gary Keehfus and other potential investors in a coffee shop in Cazenovia, New York.  *See id. at ¶17*.  During that meeting, Fromkin represented to the potential investors that he and Fromkin Energy had the knowledge and

---

[1] Plaintiffs assert the following causes of action: (1) violation of Section 10(b) of the Securities Exchange Act of 1934, 15 USC § 78j, and Rule 10b-5 of the Securities Exchange Commission, 17 CFR § 240.10b-5; (2) breach of the partnership agreement; (3) tortious interference with contract; (4) breach of fiduciary duty; (5) unjust enrichment; (6) conversion; (7) fraud; (8) claim for rescission of a contract; and (9) breach of the operating agreement. *See Dkt. No. 1.*

2

expertise to promote and develop oil and gas wells.  *See id.* at ¶*19*.  He claimed that if Keehfus invested capital in his proposed business venture, Fromkin and Fromkin Energy would be able to have six prospect wells drilled and developed within approximately two months.  *See id.* at ¶*20*.  Fromkin also explained that the rapid development of the wells would attract the interest of large third-party prospective buyers, such as Exxon, who might purchase the entire venture from investors at a significant return.  *See Compl.* ¶*22, Dkt. No. 1*.  From September to December, Keehfus and Fromkin communicated by telephone about the proposed business venture.[2]  *See id.* at ¶*23*.

On December 6, Keehfus and Fromkin met for a second time in Latham, New York.  *See id.* at ¶*26*.  Fromkin ensured Keehfus that he would be able to get six wells drilled by February, 2006 if Keehfus invested approximately $1.3 million in the venture.  *See id.* at ¶*27*.  Fromkin explained that he had retained a drilling company to drill the six wells, at a price of $230,000.00 per well.  *See Compl.* ¶*28, Dkt. No. 1*.  Fromkin guaranteed that he would not keep any portion of that sum because the

---

[2]During their conversations, Fromkin was located in Florida, and Keehfus was located in New York.  *See Compl.* ¶*24, Dkt. No. 1*.

total sum would finance the drilling contractor's fee.  *See id.* at ¶*30*.  At the December 6th meeting, Keehfus agreed to invest in the venture, and he and Fromkin executed a limited Partnership Agreement which resulted in the formation of Keehfus Limited Partnership (KLP).  *See id.* at ¶*35*. Keehfus also signed a Subscription Agreement which enrolled himself and Keehfus Holding as a limited partner[3] and a Joint Venture Operating Agreement, which authorized Fromkin to promote and explore the six prospect wells and pay the drilling contractor $230,000.00 per well to perform the necessary drilling work.  *See id.* at ¶¶*39, 60.*

On December 7, Lewis Fromkin and his wife, Beth, filed a Certificate of Limited Partnership for KLP with the Florida Secretary of State.  *See Compl.* ¶*45, Dkt. No. 1*.  The Certificate did not name Fromkin Energy as a general partner of KLP, even though the Partnership Agreement designated Fromkin Energy as the general partner.  *See id.* at ¶*47*.  On December 12, Keehfus tendered a check of $1,380,000.00 to KLP.  *See id.* at ¶*43*.  On June 2, Lewis and Beth Fromkin amended the Certificate to

---

[3]Under the terms of the Partnership Agreement and the Subscription Agreement, Keehfus would make a capital contribution of one million, three-hundred and eighty thousand dollars to Keehfus Limited Partnership in exchange for, among other things, one "unit" of limited partnership interest in KLP to be owned by Keehfus and Keehfus Holding.  *See Compl.* ¶*42, Dkt. No. 1*.

4

add Fromkin Energy as the sole general partner of KLP.  *See id.* at ¶50.

Fromkin Energy selected U.S. Energy Exploration (USEE) as the drilling contractor to perform the drilling work in Pennsylvania.  *See Compl. ¶64, Dkt. No. 1*.  Although Fromkin represented to Keehfus that USEE would perform the work for $230,000.00 per well, USEE agreed to do the drilling for only $200,00.00 per well.  *See id.* at ¶65.  Fromkin intended to keep the additional $30,000.00 per well for Fromkin Energy without disclosing the savings to the Partnership, Keehfus Holding, or Gary Keehfus.  *See id.* at ¶ 67.  In addition, Fromkin was aware that it was impossible to drill the six wells by February 2006.  *See id.* at ¶68.

On December 20, Fromkin caused Fromkin Energy to transfer Keehfus's capital contribution of $1,380,000.00 from the Partnership bank account to Fromkin Energy.  *See Compl. ¶71, Dkt. No. 1.*  Subsequently, Fromkin Energy deposited $1,200,000.00 of that money into a Partnership escrow account, keeping $180,000.00 of the capital contribution for itself.  *See id.* at ¶72.  Fromkin paid USEE $600,000.00 out of Keehfus's capital contribution to drill three wells ($200,000.00 per well).  *See id.* at ¶75.  To date, the drilling of the final three wells has not been started.  *See id.*

### III. Discussion

5

**A.     Standard of Review - Motion to Dismiss**

Rule 12(b)(6) provides that a cause of action shall be dismissed if a complaint fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  In other words, the court should dismiss the complaint pursuant to Rule 12(b)(6) if "it appears beyond doubt that the plaintiff can prove no set of facts in support of the complaint which would entitle him to relief."  *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir. 2005) (internal quotation marks and citation omitted).  "A court's task in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 72 (2d Cir. 2003) (internal quotation marks and citation omitted). Therefore, in reviewing a motion to dismiss, a court "must accept the facts alleged in the complaint as true and construe all reasonable inferences in [the plaintiff's] favor."  *Fowlkes v. Adamec*, 432 F.3d 90, 95 (2d Cir. 2005) (citation omitted).

**B.     Choice of Law**

Defendants' motion seeks dismissal of plaintiffs' claims for tortious interference with a contract, unjust enrichment, conversion, rescission, and

breach of the operating agreement.  As an initial matter, the court must address the substantive body of law that governs plaintiffs' claims.  Defendants argue that Florida law should apply, while plaintiffs argue that New York law governs.  "Choice of law does not matter...unless the laws of the competing jurisdictions are actually in conflict."  *IBM v. Liberty Mutual Insurance Co.*, 363 F.3d 137, 143 (2d Cir. 2004).  Laws are in conflict "where the applicable law from each jurisdiction provides different substantive rules[.]"  *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).  "In the absence of substantive difference, however, a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."  *IBM*, 363 F.3d at 143.  Federal courts sitting in diversity look to the choice-of-law rules of the forum state.  *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

Here, there is an actual conflict between the laws of New York and Florida insofar as they treat differently two of plaintiffs' claims.  Indeed, Florida law does not provide for a tortious interference claim against an agent of a contract to which it is a principal or a party, *see Bertram, Inc. v. Sterling Bank & Trust*, 820 So. 2d 963 (Fla. Dist. Ct. App. 2002), while New York allows such a claim where it is alleged that the agent acted in bad

7

faith, *see BIB Constr. Co., Inc. v. City of Poughkeepsie*, 204 A.D.2d 947, 948 (3d Dep't 1994). Similarly, Florida law interprets the term "specifically identifiable funds," a common element of a claim for conversion, differently than New York law. *Compare Belford Trucking Co., Inc. v. Zagar*, 243 So. 2d 646, 648 (Fla. Dist. Ct. App. 1970) ("The requirement that the money be identified as a specific chattel does not permit as a subject of conversion an indebtedness which may be discharged by the payment of money generally.") *with Jones v. Dana*, 06-CV-0159, 2006 U.S. Dist. LEXIS 25293, at *82 (S.D.N.Y. May 3, 2006) ("Under New York law,...an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question."). As such, the court must decide which body of law governs plaintiffs' claims for conversion and tortious interference with a contract.

In New York, there are two different "choice-of-law analyses, one for contract claims, another for tort claims." *Globalnet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 383 (2d Cir. 2006). "The New York Court of Appeals has held that the relevant analytical approach to choice of law in tort actions in New York is the interest analysis." *Id*. at 384 (citing

8

*Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197 (1985)).  The interest analysis requires that "the law of the jurisdiction having the greatest interest in the litigation will be applied and...the [only] facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."  *Id*. (internal quotation marks and citation omitted).  "Under this formulation, significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort[.]..."  *Id*. (internal quotation marks and citation omitted).

Under the interest-analysis test, torts are divided into two categories.  *See Globalnet Financial.com, Inc.*, 449 F.3d at 384.  The first category includes torts that govern "the appropriate standards of conduct, rules of the road, for example[.]"  *Id*.  The second category of torts includes "those that relate to allocating losses...result[ing] from admittedly tortious conduct...such as those limiting damages in wrongful death actions, vicarious liability rules, or immunities from suit."  *Id*. (internal quotation marks and citation omitted).  "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."  *Id*. at 384 (internal quotation marks and citation

9

omitted). If, however, "the conflict involves allocation of losses, the site of the tort is less important, and the parties' domiciles are more important." *See Globalnet Financial.com, Inc.*, 449 F.3d at 384-85 (internal quotation marks and citation omitted).

Here, plaintiffs' claims for tortious interference with contract and conversion fall into the category of torts governing the appropriate standards of conduct. As such, the law of the jurisdiction where the alleged tort occurred will apply because that jurisdiction "has the greatest interest in regulating laws within its borders." *Id*. at 384.

### 1.     Tortious Interference with Contract

Here, plaintiffs allege that Lewis Fromkin tortiously interfered with the Partnership Agreement by causing Fromkin Energy to remove $180,000.00 from the KLP account and therefore breach the Partnership Agreement. *See Compl.* ¶¶105-109, Dkt. No. 1. The alleged misconduct occurred in Florida where the KLP bank account is located, the funds were therefore held, and Fromkin resides. As such, the alleged conduct supporting plaintiffs' claim for tortious interference of contract occurred in Florida, and Florida law applies.

Under Florida law, "[i]n order to maintain an action for tortious

interference with contractual rights, a plaintiff must prove that a third party interfered with a contract by influencing, inducing or coercing one of the parties...to breach the contract, thereby causing injury to the other party." *Bertram, Inc.*, 820 So. 2d at 965. "An agent of a corporate party to a contract, acting within his capacity and scope as an agent, cannot be considered to be a separate entity outside of the contractual relationship which can tortiously interfere with that relationship." *Id*.

Here, plaintiffs allege that Fromkin is a principal of Fromkin Energy. As an agent of Fromkin Energy, Fromkin cannot as a matter of law tortiously interfere with the Partnership Agreement under Florida law. *See id.* Accordingly, because plaintiffs' complaint fails to state a legally sufficient claim for tortious interference with a contract under Florida law, such claim is dismissed.

### 2. Conversion

The alleged misconduct supporting plaintiffs' claim for conversion is the unlawful "removal of $180,000.00 from the partnership account." *See Compl. ¶¶ 136, Dkt. No. 1*. As stated, Fromkin resides in Florida, Fromkin Energy is a Florida partnership, and the bank accounts for Keehfus Partnership are located in Florida. Therefore, any alleged conversion of

11

funds from the Keehfus Partnership bank account would have occurred in Florida. Accordingly, since Florida has the greatest interest in regulating the alleged conversion, Florida law applies.[4]

Under Florida law, "conversion is defined as an act of dominion wrongfully asserted over another's property inconsistent with the ownership of it." *Belford Trucking Co.*, 243 So. 2d at 648. Defendants argue that the funds at issue are not identifiable, and therefore, plaintiffs' claim for conversion fails under Florida Law.

Indeed, Florida's definition of "property" in a claim for conversion "has been the subject of considerable discussion, especially where the property alleged to have been converted consists of money or intangibles." *Id*. In Florida, "[t]he requirement that the money be identified as a specific chattel does not permit as a subject of conversion an indebtedness which may be

---

[4] Alternatively, defendants argue that the complaint also fails to state a cognizable claim for conversion under New York law. In New York, "it is well settled that an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Jones v. Dana*, 06-CV-0519, 2006 U.S. Dist. LEXIS 25293, at *82 (S.D.N.Y. May 3, 2006). Defendants argue that Fromkin had no obligation to return the funds to Keehfus or the Partnership. Instead, pursuant to the Partnership Agreement, Fromkin was required to use the funds for the purpose of drilling oil wells, and defendants claim that they fully complied with their obligations under the Partnership Agreement. As such, defendants argue that plaintiffs fails to state a claim for conversion under New York law because there was neither an improper treatment of the funds nor an obligation to return the funds. Because, at this juncture, the court holds that Florida law applies, it is unnecessary to consider the merits of plaintiffs' conversion claim under New York law.

discharged by the payment of money generally." *Belford Trucking Co.*, 243 So. 2d at 648. Florida courts have carved out exceptions to this rule, holding that, "money [is] a proper subject of conversion where a sum of money sealed in an addressed envelope was misdelivered, *S. Express Co. v. Van Meter*, 17 Fla. 783 (1880), and where a specified sum of money in a deposit bag was never credited to the depositor's account, *Armored Car Serv., Inc. v. First Nat. Bank of Miami*, 114 So. 2d 431 (Fla. Dist. Ct. App. 1959)." *Id*. at 648. However, under almost all other circumstances, an action for conversion will only pass scrutiny under Florida law "if the specific money in question can be identified." *Joseph v. Chanin*, 940 So. 2d 483, 486 (Fla. Ct. App. 2006) (citation omitted); *Hofrichter v. Zuckerman & Venditti*, 710 So. 2d 127 (Fla. Ct. App. 1998).

"To be a proper subject of conversion each coin or bill need not be earmarked, but there must be an obligation to keep intact or deliver the specific money in question, so that such money can be identified." *Belford Trucking Co.*, 243 So. 2d at 648. Indeed, when money is the subject of a claim for conversion, it is

> capable of identification where it is delivered at one time, by one act and in one mass, or where the deposit is special and the identical money is to be kept for the party making the

13

>deposit, or where wrongful possession of such property is obtained.

*Id*.  For example, money, as the proper subject of a claim for conversion, is considered to be specifically identifiable as required by Florida law where it "is to be held in constructive trust until the occurrence of a specified event." *Id*.

Here, the actual money at the heart of this dispute is a sum of $180,000.00, which plaintiffs claim that defendants improperly converted. The alleged sum was contemplated by the parties to be used for a particular purpose, namely, the purpose of commencing preparatory drilling operations.  Florida law provides a claim for conversion where it is based on a fiduciary's failure to keep and hold funds for a specified purpose.  *See Hofrichter*, 710 So. 2d at 127.  The Florida Court of Appeals has expressly held that because a "partner is a fiduciary with respect to other partners..., and partnership assets are in essence held in trust by each partner for partnership purposes[,]" an action for conversion "will lie where there is a claim that the defendant has misappropriated...trust funds[.]"  *Id*. at 128-29. Plaintiffs' complaint alleges the following: (1) that the parties were business partners, (2) that the $1.38 million capital contribution was partnership

14

.
.

property to be held in trust for partnership purposes, and (3) that defendants converted $180,000.00 of that property for personal use. *See Compl., Dkt. No. 1.* At this early juncture, these facts state a claim for relief under Florida law. Accordingly, defendants' motion is denied insofar as it seeks dismissal of plaintiffs' claim for conversion.[5]

**C.  Standing**

Defendants argue that Gary Keehfus and Keehfus Limited Partnership lack standing. As such, they claim that the only proper plaintiff in this case is Keehfus Holding. Specifically, defendants argue that Gary Keehfus lacks standing to sue because he is not a party to any contract at issue in this case and he is not a partner of Keehfus Limited Partnership. They argue that the real party at interest is Keehfus Holding, and therefore, Gary Keehfus and Keehfus Limited Partnership should be dismissed from the lawsuit.

However, as plaintiffs correctly point out, Gary Keehfus did sign the

---

[5] Alternatively, defendants argue that plaintiffs' claim for conversion should be dismissed under the economic loss rule. The economic loss rule prohibits tort actions where the damages alleged are the same as those for breach of contract. *See Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494-95 (Fla. Dist. Ct. App. 1994). As the Florida Court of Appeals has explained, when the claim involves intentional misconduct involving the conversion of partnership property, it is "more than a simple breach of contract." *Hofrichter v. Zuckerman & Vanditti*, 710 So. 2d 127 (Fla. Dist. Ct. App. 1998).

Partnership Agreement, and the allegations are specific to Keehfus in his capacity as the sole member of Keehfus Holding.  In addition, plaintiffs stipulate that there will be no double recovery as between Keehfus Holding and Gary Keehfus.  Accordingly, at this juncture, the court declines to dismiss Gary Keehfus from the lawsuit.

Moreover, the parties agree that, under Florida law, a limited partner may bring a derivative action to enforce rights of the limited partnership when it would be futile for the general partner to sue.  *See* FL. STAT. §§ 620.2002(2), 620.2005.  Here, the complaint specifically alleges that it would be futile for Fromkin Energy to sue itself for misappropriation, fraud, and theft.  Plaintiffs concede that Keehfus Limited Partnership was named in certain claims on a nominal basis since Keehfus and Keehfus Holding can bring claims on the Partnership's behalf.   Accordingly, these claims are derivative claims.

**D.**     **Failure to State the Claims for Unjust Enrichment, Conversion, Recission, and Breach of the Operating Agreement**

Defendants argue that the allegations in the complaint do not support plaintiffs' claims for unjust enrichment (Count V), conversion (Count VI), recission (Count VII), and breach of the Operating Agreement (Count IX).

16

Plaintiffs have consented to withdraw their claim for recission, and it is therefore dismissed.  As to the remaining counts, at this early juncture and drawing all inferences in plaintiffs' favor, the complaint states viable claims for unjust enrichment, conversion, and breach of the Operating Agreement. Accordingly, the remainder of defendants' motion is denied.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that defendants' renewed motion to dismiss (*Dkt. No. 36*) is:

>  (1) **GRANTED** insofar as it seeks dismissal of plaintiffs' claim for tortious interference and

>  (2) **DENIED** insofar as it seeks dismissal of plaintiffs' claims for conversion, unjust enrichment, and breach of the operating agreement; and it is further

**ORDERED** that plaintiffs' claim for recission is **DISMISSED**; and it is further

**ORDERED** that the Clerk provide a copy of this Decision and Order to the parties.

**IT IS SO ORDERED.**

August 23, 2007

Albany, New York

/s/ Gary L. Sharpe
Gary L. Sharpe
U.S. District Judge